Good afternoon. We're going to call Juan General Hospital vs. Amgen. Mr. Corrigan. Thank you, Your Honor. I'm Jeff Corrigan. I represent Juan General Hospital. We have two issues in this case, basically. One is a standing issue and one is the time issue. I'll start with the standing issue, which has been described in many other cases as a threshold issue. And standing is about as basic a concept as you can get. It goes back to the U.S. Constitution and from the U.S. Constitution flows the Clayton Act. The Clayton Act, the first six words of the Clayton Act is, any person who shall be injured. So injury is always at the heart of a standing analysis. When we get to Illinois Brick, which is talked about quite thoroughly in the papers, injury is at the heart of Illinois Brick's statutory analysis. As the defendant said in their brief, Illinois Brick is a case of statutory construction. In Illinois Brick, in a number of cases, they refer to the overcharged direct purchaser. Again, it's a standing case. The overcharged direct purchaser, and not others in the distribution chain, is the party injured in the business or property, which is quoted in the Clayton Act. Now in this case, Warren General Hospital is the overcharged direct purchaser. The wholesaler is not injured in any way by the alleged tying offense. Well, are they the direct purchaser? That's the issue. They are not the overcharged direct purchaser. The harm in this case... They're not an overcharged direct purchaser, they're just not a direct purchaser, is that true? That's correct. Under the definition of Illinois Brick and its progeny, it is not a direct purchaser. Illinois Brick is a price-fixing case. Utilitorp is a price-fixing case. The harm stems from the mere purchase of the overpriced product. Well, are you suggesting Illinois Brick doesn't apply here? No, Illinois Brick does apply. We are four score under Illinois Brick. We are not past or exception under Illinois Brick. The courts have been low with the grant bills. We understand that. It sure sounds like an exception though. When you talk about the standard analysis, there has to be harm. If you don't have harm, you're not even part of the equation. And the factual situation here runs like this. Well, you're telling us then that the wholesaler could not have brought this action because the wholesaler was not injured. That's correct, Your Honor. That doesn't say we've got to keep going downstream to find somebody that was injured. Well, in all the cases, the Illinois Brick and Utilicorp and others, there was always an upstream purchaser. And the upstream purchaser was selected as the best plaintiff other than the downstream purchaser. But the downstream purchaser in all those cases was able to bring an action. One of the policy considerations in Illinois Brick, clearly, is to empower private attorney generals to bring private causes of action. So in this situation, Illinois Brick and Utilicorp, the upstream purchaser was able to bring a cause of action because they were injured. They were injured in the same way the indirect purchaser was injured. So the indirect purchaser's injury is derivative of the direct purchaser's, another way of saying it. So you're saying that if, let's say, you pass the cost on to your ultimate user, would the ultimate user then be able to sue because they may be injured more? We would say that our ultimate users, yes, our patients, our cancer patients, would be indirect purchasers. They would have a cause of action. It's further down the stream that the distribution chain has been honest. As long as you fall into the category of an indirect purchaser and you suffer an injury, you have standing to sue. You have standing as an indirect purchaser maybe on the state court, but you would not have standing to sue in federal court. How do you have standing in federal court? You have standing in federal court as the overcharged direct purchaser. How are you a direct purchaser? Well, there's a couple different ways. One is we are the first harmed party. Now, harmed party. There's a sports racing case. It's a 10th Circuit case that we've talked about in our briefing. The sports racing case has an analysis that went like breaking new telephone. Now, what they say, again, is what I said before. In all those cases, they're price-fixing cases. The harm stems from being a purchaser product. But, again, how are you a purchaser? You're suggesting that the harm dictates whether you have standing or not. Yes. In some ways, yes. Just because you're harmed? I mean, you have many others could be harmed by the alleged tying scheme. We are harmed in what sports racing says is, and it says that we are the first innocent purchaser in the chain of distribution. And innocent is in quotes. And they define innocent purchaser as, one, the direct victim of the anti-competitive acts, and, two, we are the first party in that distribution chain with a cause of action. I've not heard of direct purchaser defined that way. But I have heard of direct purchaser as the purchaser who makes a direct purchase, who negotiates a contract with, for example, in this case, Amgen, and who receives the product from Amgen. But none of that applies to you, as I understand the record. In other words, you did not pay Amgen for the drugs that you sought to purchase. That's correct. Nor did you negotiate a contract with them. Yes. You did not receive the supplies from Amgen. That's correct. How are you a direct purchaser? You didn't pay them directly. You paid someone else. You didn't get the products from Amgen, and yet you are a direct purchaser. Well, the way this tying scheme works is we pay a price. I know the way. Well, go ahead. I think you need it for your argument. Okay. If you say I need it, then I better get it to you. Well, I don't have to take my word for it. We'll get into it. We pay the wholesaler for the drugs. But the price we pay the wholesaler is what I would call an MSRP price. It's a meaningless price. And Amgen knows it's meaningless. How do they know? That's why they have these rebate contracts, because the price is meaningless unto itself. Who sets the cost? Doesn't the wholesaler set the cost? The wholesaler sets the cost initially. But the key price, the effective price, is the wholesale cost minus the rebates. And that's where we have direct contacts with Amgen. The contract was negotiated with Amgen at Warren General Hospital with a representative of Amgen. They send the rebates directly to our hospital. And when we have a service on the contract, it is with Amgen directly. So the rebates are key. Do we know from this record why you dealt to a wholesaler by carrying on the whole transaction directly with Amgen? What Amgen says in their appellate brief is that Amgen only sold these drugs to a wholesaler. Why would I guess that? Because in a standard antitrust price-fixing case, a wholesaler gives you insolence against liability on direct purchasing cases. But in a tying case, it should not. Once they send the rebates to us directly, then we have an effective price. We have the price we paid, the MSRP-type price we paid the wholesaler, minus the rebates. That is the effective price. The effective price is then compared to the Medicare reimbursement rate. And that is where the harm comes in. The wholesalers do not get rebates. The wholesalers do not get reimbursed by Medicare. Amgen knew exactly what they were doing. They understand the Medicaid rates. They are well known. They geared the rebate level so that if you do not buy enough of the red blood cell drugs, you will not receive enough rebates on the white blood cell drugs, and you lose money on your purchases of the white blood cell drugs that we use for cancer patients. What was the role that Amerisource played in negotiating the contracts? The contract on rebates? No, well, the contracts with Amgen. Amgen, well, the actual purchase contract, again, they purchased the drugs through. And if this were a price-fixing case, Judge, I would not be here wasting your time. But this is a different animal. They pay the wholesaler the cost for the drugs, but again, that cost is an illusory, meaningless price. The key here is the rebates, and that is why Amgen has taken total control of the rebate transaction. They negotiate the contracts. They pay it directly. I urge the court to take a look. I may not have time now, but in the appendix, there are a number of documents, page 264, I would urge the court to take a look at. And that is a statement. It's called a market share performance statement, and that is consent from Amgen to Warren General Hospital. If you take a look in the upper left-hand corner, it says Warren General Hospital. In the upper right-hand corner, it says Momentum II Enhanced. That's the name of the contract. And in the lower right-hand corner, you'll see a number of references to your agreement. Your agreement is our agreement. Warren General Hospital's agreement with Amgen. There are direct interactions there. And then you'll see on the left side in the middle how the scheme works. If you buy enough of the red, you get a bump on the rebates on the white. Do you have any agreements with Amerisource? We do. What are those agreements? In terms of these drugs, it's just a complete pass-through. I mean, I wouldn't say a complete pass-through. You characterize it, but there's something more specific than that, isn't there? We have a contract with them. When we want to buy drugs, we ask them for drugs. They send us the drugs. Drugs from Amgen. Yes, Amgen and others. You categorize them as a straw man.  For what purposes? Again, if we were dealing with a price-fixing case, I wouldn't be here. But this case, all they do, and we allege it as well, that Amgen views these drugs. These are big money-making drugs, billions of dollars. Amgen has told our client, do not negotiate the price of these drugs with a wholesaler. If you've got an issue with these drugs, you call us directly. That's unusual. Most drugs aren't dealt with through a wholesaler. That's what they're there for. Do you tell Amerisource the quantity and kinds of drugs that Warren General Hospital needs? Yes. So you work that through Amerisource. You pay them. They set a price. They send you the drugs. How are you a direct purchaser for Amgen? I'm wondering how we get around this lunar break problem or issue, and why are you not seeking us to carve an exception for you? Let me look at this a little bit different. This court, the lower court, called this a bright-line rule. We talked about a couple of different cases. The Mercedes-Benz case, which is not precedential to this court, but it's an instructive decision nonetheless. The Mercedes-Benz case took instruction from the Gulfstream case. The Gulfstream case was an unusual type of case. One of the quotes from Gulfstream's case was, this is not a purchaser in the ordinary sense of the word. And if we were to take defendant's argument, it would exalt form over substance. The district court judge in New Jersey looked at that. That was a constitutional standing case, wasn't it? It was an antitrust standing case. Antitrust standing case. In both cases, didn't they both involve direct purchases? I mean, really direct purchases between the plaintiff and defendant at some point? Both Gulfstream and Mercedes-Benz. Mercedes-Benz involved direct interactions with the defendant. And the court said, this is an unusual case. It's not like a lunar break. There were a lot of direct interactions between the indirect quote, and the manufacturer. We have the same interactions here. And then some. But the Gulfstream case is specifically not a bright-line case. And Gulfstream comes at this a little differently. Let me come at this a little differently. 1977, no longer. In that case, if I remember correctly, it was a person who made the purchase directly, wasn't it? It was a purchase of an airplane made by a pilot. In any event, it was a direct purchase of an airplane. And then there was an assignment of the right to purchase. But you did have a direct purchaser who had to make a direct payment. So how does that case help you? Well, the case helps us in that the way Mercedes-Benz looked at it, it said Gulfstream is required to district courts to look beyond the limited definition of direct purchaser to other facts suggested of direct purchaser status. It's not just a bright-line rule. The district court cited several cases in its opinion. But you did have a very, very direct purchaser in the Gulfstream case. Well, the issue there, what made it unusual, was they signed a purchase agreement, then assigned the purchase agreement, and never purchased the plane. So the Neventans said, we've got a purchase agreement, but they never purchased it. And that's why the court said this is not a purchaser in the ordinary sense of the word. And Judge Walz took that to mean, let's take a look at what you're doing. That's the language that you say helps you. You're not a purchaser in the ordinary sense of the word? Yes. Yes. Now, if you look down the road a piece, after a line break, you have the AGC case, the Associate General Contractor's case. Now, it didn't overrule a line break, certainly. But it's instructive. That case is anything but a bright-line case. There's a city of Pittsburgh case in the Third Circuit, 1998, which says antitrust standing inquiry is not a black-letter rule, but a balancing test comprised of many factors. And the AGC case is anything but a bright-line case. It looks at all kinds of factors, the causal connection between the harm and the anti-competitive conducts. Can you focus on Delaware Valley Surgical Supply? That's a Ninth Circuit case. I mean, that seems to be on all fours in this case. Maybe not in your view, but... Not surprisingly, it's not in my view. And the key difference is Delaware Valley did not have a tying case. Delaware Valley, the harm was, again, derivative. The indirect purchaser harm was derivative of the direct purchaser harm. In this case, the harm passes over the wholesale without touching it. My sense is that the jurisprudence on this issue favors bright-line rules, and this favors causing exceptions to the standing issue. Your Honor, I can see my time is up, but I will say that Illinois BRIC on its face is about overcharged direct purchasers. If you do not have harm, you are not part of the equation, and Illinois BRIC is not talking about you. And that's what a wholesaler puts into this scheme. Thank you, Mr. Court. Thank you, Judge. Mr. Birchfield? Thank you, Your Honor. Bobby Birchfield for Amgen. May it please the Court. Let me begin by simply noting that the Court— I take Judge Pollack's admonition from earlier this morning not to take too much from the questioning of the Court. But I think the questions of the Court have focused in on the real issue. For over 30 years, the Supreme Court has rigorously and stringently applied the Illinois BRIC direct purchaser rule in all antitrust overcharge cases. The Illinois BRIC rule derived from Hand Over Shoe, which is a Section 2 case, not even a Section 1 case. So for the counsel to suggest that because this is a tying case, Illinois BRIC might not apply is inaccurate. Illinois BRIC applies in all overcharge cases. This Court dealt with a very similar situation, I would respectfully submit, in the Howard Hess dental case, where the plaintiff purchased dentures through distributors. And in that case, even in situations where the plaintiff received drop shipments, which the Court defined as situations where the wholesale of the distributor was out of inventory for the product and it was shipped directly from the manufacturer. Even in those instances, the Court held that the plaintiff was an indirect purchaser. This case is the same. The transaction here is that Amgen sells the two drugs, the three drugs, to a wholesaler. In this instance, it's AmerisourceBergen, as Judge Fuentes correctly noted. And AmerisourceBergen then sells them on to the plaintiff, to the ultimate medical services provider, to sell them on, as counsel noted, to patients. Of course, Mr. Corrigan brings in other factors. For example, there are contracts that Warren General apparently has with Amgen. And those contracts are negotiated and signed at Warren General Hospital. And they are contracts for the purchase of these drugs. That's correct, Your Honor. There are contracts between Amgen and various health care entities. But that's not pertinent, I would respectfully submit, for your own analysis. It is the chain of purchasing. And to be clear here... But are those contracts not for the purchase of the white and red blood cell factors, which are tied together? Those contracts indicate the amounts of rebates that the plaintiff will receive in the event that they purchase certain quantities of those drugs. Any overcharge here necessarily flows through the chain of distribution. It is the price that AmerisourceGeneral pays to Amgen and then the price that the hospital pays to AmerisourceBergen that contains the overcharge. Do the contracts that are negotiated include specific amounts that Warren General Hospital seeks to purchase? There is no commitment in the contracts to purchase a certain amount. It is only if they reach certain tiered discount levels that they qualify for certain rebates. All right. If they purchase a certain volume they're entitled to, the higher the volume or the higher the purchase, the more rebate, the higher the rebate amount. Is that the purpose of the contract? And to be fair, that is the purpose of the contract. And to be fair, those rebates also vary depending upon the mixture of the drugs that they buy. So much of the red drugs, so much of the white drugs, will vary the amount of the rebate. But the key point here, Your Honor, I would suggest in the Illinois BRIC analysis, is that the overcharge is flowing through the chain of distribution. The rebates are not through the chain of distribution. They are Amgen payments back to Warren General. Any overcharge has to go through the chain of distribution. Plaintiffs aren't complaining that they're getting too much rebate. They're complaining that the original price is too high and that they're not getting enough rebate. So the overcharge goes through the chain of distribution. Let's assume for a moment that the tying scheme is in fact illegal. Amerisource doesn't have a claim, does it? Well, at least Warren General says they can't or don't file a claim. They will not file a claim. So there really is no one to file a claim that can challenge the asserted illegal scheme. Well, Your Honor, I think I haven't really considered whether Amerisource Bergen would have a claim for tying, but a tying arrangement would affect the mix of products that flows through Amerisource Bergen's distribution channel. Absolutely, if the tying is as effective as the plaintiff's claim it is. Because in their view, more of certain products and less of others are flowing through that distribution channel. So yes, I think Amerisource Bergen hypothetically could be affected by this tying, this alleged tying. Now, when Amerisource gets the white and or red blood cells from Amgen, does it purchase them tied or does it purchase them separate? Or is their purchase from Amgen contingent on contracts, independent contracts that you have with customers like Warren Hospital? Forgive me for disagreeing with your characterization of them as being tied, but, Your Honor, Amerisource Bergen purchases quantities of these drugs. I believe that they pay what is called the wholesale acquisition cost for the drugs. I don't know if I asked my question correctly. Do they buy the drugs separately? Do they buy quantities separately from Amgen? Or are the purchases they make from Amgen dependent on contracts such as Warren General has with Amgen? Ultimately, the contract does not specifically indicate that they purchase specific amounts dependent on what Warren General purchases. But I would submit to the court that as a business proposition, they absolutely purchase the amount of drugs from Amgen that they're going to need to fill the orders that are placed by the indirect purchasers down the chain, just as Warren General purchases the amount of drugs they need to administer to their patients. Does Warren General place orders with Amgen? Or does he place orders with Amerisource? Warren General places orders with Amerisource. Okay. That's my understanding of the record. That's correct. Are the rebate arrangements negotiated between Warren and Amgen? The rebate arrangements at the outset, Judge Pollack, are negotiated with group purchasing organizations. In this instance, the GPO is called Vermeer Partners. Then that template contract is given then to the individual, to Warren General and the hospitals, and that template contract is filled in with its specific rebate triggers, and that's how that process is done. The rebate amounts are negotiated first with the GPO, and then that template is applied to the hospital purchasers. Is that your question? Is Warren General obligated to buy from Amerisource, Bergen? Can Warren General just say, I'm going to go to another wholesaler and purchase? If he can. I believe Warren General has their choice of which wholesaler they're going to buy Amgen's products from, but Amgen is not in the business of selling directly to hospitals for many reasons. I just was wondering whether perhaps Amgen dictates who Warren General Hospital can go to to purchase their product. There are a number of wholesalers out there, and I'm not aware of any, and it certainly hasn't been addressed in this case, that Warren General is locked in to purchase its requirements from Amerisource. There aren't too many places to go for white blood cell growth factors, is there? If Your Honor is suggesting that Amgen is the primary manufacturer of white blood cell growth factors, that is correct. Amgen markets to Neulasta and Dupagen. There is a third that does not have a significant market presence. That's Leukine, and that alleged fact we have not disputed, and it is not central to the decision of this case. Let me ask this. I have to start with a disclaimer of neutrality. Within the confines of this courtroom, I'm not a great admirer of Illinois Brick. On the other hand, there are some rules, I think, in this circuit about following Supreme Court decisions. What elements would have to change in the transaction that's presented here for your client to be suable? Or has Amgen put itself in a position that by only selling to wholesalers, it's perfectly insulated from claims of this kind? Your Honor, approximately four years ago, Amgen did not feel insulated because it was sued in a massive antitrust suit by its competitor, who alleged that it was being adversely affected by the very arrangements that are challenged here, and indeed the complaint here is largely taken verbatim from the complaint by Johnson & Johnson's subsidiary, Ortho. That's the first answer. In terms of how Warren General could ever have an antitrust overcharge claim against Amgen under Illinois Brick, and you're absolutely right. There has been much criticism of Illinois Brick, and many state legislatures have enacted Illinois Brick repealer statutes. There are about 36 or 37 of those. So Illinois Brick is not the most popular girl at the dance, perhaps, but it is the law of the land. For Warren General to have an antitrust overcharge claim against Amgen, it would have to purchase the product directly from Amgen, and it hasn't done so. Does Amgen sell to hospitals directly? It's my understanding, Your Honor, that they make their sales through the wholesalers, not directly to hospitals. So why is Warren General not a direct purchaser in this case? It is not a direct purchaser because, as in the Howard S. Dental case, it orders the products directly from an intermediary, it receives them from any intermediary, it pays the intermediary, and any rebate arrangement it gets is outside that normal chain of distribution. Any overcharge, I can't emphasize this heavily enough, any overcharge, any increase in the price has to flow through the chain of distribution because it certainly isn't flowing from the rebate, which is a payment of money from Amgen, back to Warren General. I'm happy to answer any of the questions you have on the Illinois Brick issue, but let me take a moment and talk about the time claim, which, of course, the court does not need to address if it rules that the plaintiff lacks antitrust standing. Judge Chesler, as an alternative basis for his decision, ruled that the plaintiff had not alleged a legally sufficient per se illegal time claim. Plaintiff has appealed on the issue of per se illegal time, and it has not made a sufficient allegation under that theory either. Under the Northern Pacific Railway case, the Supreme Court defined time as, quote, an agreement by a party to sell one product but only on the condition that the buyer also purchases a different or tied product or at least agrees that he will not purchase the product from any other supplier. In the Smith-Klein decision by this court, the court interpreted the Northern Pacific to require an actual condition sale, and Smith-Klein— Is that a dicta, though? Your Honor, we've asked ourselves that question. I'm happy to report we sought the briefs from the Jenkins Law Library, and that issue of the time issue was presented to the court. So it is not dicta. It is a holding. It's the law of the circuit. And the district courts in this circuit have followed that, holding repeatedly to require, particularly per se time cases, to require an actual condition sale. Separate availability, which is conceded here, is fatal to a legally sufficient per se time agreement. But other circuits say something different, right? They do. They do. Your Honor, I would simply note in defense— not that the court needs my defense, but in defense of the position of the Third Circuit on this issue, as you well know, the Supreme Court and the law generally have been moving away from per se illegality in political arrangements. Just a couple of years ago, in the Legion case, the court abandoned resale price maintenance as a per se offense after 90 years. It would not be appropriate, in my view, for the Third Circuit to move away from where it is now, a strict requirement of condition sale to a per se offense for time. Because that is obviously not the direction, not where the court is, and it's not the direction the law is going. Unless the court has further questions, I will cede the rest of my time. Thank you, Mr. Birchfield. Thank you. Mr. Carty? I don't suppose Mr. Birchfield wants to give me the rest of his time. I hope not. Your Honor, Mr. Birchfield mentioned a couple of times the Howard Hess Dental Laboratories case against dense blood, and the court at the lower level sided that case as support for Illinois brick being a bright-line case. But if you look at that case, they discussed the Illinois brick policy justifications in great detail, one by one, the first policy concern, Illinois brick's second policy concern, Illinois brick's third policy concern. Thus, all three of Illinois brick's policy justifications argue against adopting the unlimited exception. This is not support for a bright line. If you look at Illinois brick's policy justifications, none of them apply to our case. There is no overcharge to be passed through here, so there is no problem with divvying up the overcharge. Illinois brick's other policy justification is that they wanted to empower private attorney generals to bring private suits, and the sports racing case makes it clear that what Illinois brick is not is a rule indianizing defendants against anti-competitive, against suits challenging their anti-competitive conduct, and that's what will happen here. Mr. Birchfield mentions that a competitor sued them. Well, a competitor did sue them. They got $200 million for their troubles, but no one else in the distribution chain should consider them, particularly not the wholesaler. As the court pointed out, Mr. Birchfield pointed out, the agreement, the purchase from a lawrence general to the wholesaler changes the amount of drugs that channel through the system. That has nothing to do with the harm here. In a price-fixing case, yeah, the mere purchase of the product is the harm, but that's not what's happening here. Now, I'll touch briefly on the per se time case. Mr. Birchfield. May I ask one question? Sure. My recollection is that in your opening argument, you said that those who get the drugs from the hospital, cancer patients, they would have standing to sue. Did I understand you correctly in saying that? They would have standing not to sue under federal law. They would have standing to sue under indirect statutes in various states. That's what I meant, Judge. In the per se time case, Mr. Birchfield mentions footnote three in the Smith-Klein case, and it recites that five different times. Now, footnote three says what he says it says, but if you look at footnote three further, footnote three is a monopoly case, but footnote three, the last paragraph, says in the absence of a formal agreement, the plaintiff must establish in some other way that a time was involved, and that can be done by proof that purchase of Thai product was not voluntary, i.e., by proof of coercion. So it doesn't need to be a condition. By the Smith-Klein rule, it can be coercion. You can buy the two drugs separately, can't you? Technically, yes. From the engine. Technically, yes, but I have an example I'll use, and it's an example from the movie The Godfather. At one point in the movie The Godfather, there's a story that comes up, and Don Corleone goes to a bandleader, and he brings his top henchman, Luca Brasi, and the Don says to the bandleader, I can assure you either your brains or your signature will end up on that contract, while Luca Brasi held a gun to his head. Now, under the strict terms of what the Don says, he's got a choice. He doesn't have to sign. But Luca Brasi's gun is the coercion. He doesn't have a choice, and the coercion has become the condition. You don't need a condition. You need coercion. I was thinking of Amgen with a gun. That's what I wanted to mention. Now, there's one other case that I want to mention. But seriously, even if not Amgen, you could purchase red blood cell factors from other suppliers, other manufacturers. Ortho, be one of them. The whole point of the scheme is if we don't purchase enough red from Amgen, we have to purchase the white from Amgen. But you go to them so that you can get that discount or rebate, however you like, right? Right. You can't go to anybody else, you say, to Ortho for red blood cell factors and some other manufacturer or supplier for white blood cell factors. That's right. I mean, in a lot of the cases on time, they say the first thing to do is market power. If they have market power, they can make this work. And the market power in the white blood cell is what starts it. We can't go anywhere to buy the white. We have to buy it from Amgen. So in order to do that, we have to make that work for us financially. If we don't buy enough red from Amgen, we wind up buying the white at a loss after the reimbursement from Medicare. We can't do that. Would you have a case if Medicare paid you the same amount that you paid Amgen? No, I don't think we would. But Amgen knows that, and that's why they've rigged it this way. They've rigged it so it's a game of inches. If you get X amount of rebate, you're over water. And if you get X minus a certain amount, you're under water. We can't be under water. That's where the coercion comes in, and the coercion has become the condition. Thank you very much. Thank you, Mr. Corrigan. And Mr. Birchfield, thank you very much. Very difficult case. Well argued, both of you. Thanks. We'll take the case under advisement. Thank you. Thank you.